Mr. Levy, good morning, whenever you're ready. Good morning, Your Honor, and may it please the Court. The FRA in this case granted a waiver of the Buy America mandate to permit Brightline to contract with Siemens to procure trainsets manufactured abroad when my client Alstom stood ready to manufacture them here. The FRA justified the waiver on the basis that the non-availability waiver under the statute supposedly varied by technology and design or really by supplier. Because that has no basis in the statute and because the government's action was arbitrary and capricious, my client sued and the case was dismissed for lack of standing. The Court should reverse the standing decision and reach the merits and order judgment in favor of my client. Alstom here was one of two suppliers of trainsets. The record is clear that there are only two manufacturers in the world who have manufactured high-speed trainsets, Alstom and Siemens. Alstom was described as a competitor in the papers below and in the submissions to the FRA. The FRA granted the waiver recognizing that Alstom could build the trainsets abroad and did so recognizing that it would increase competition and that the waiver was necessary for Siemens to build the trainsets and to be contracted with. Therefore, there is an injury in fact, indeed multiple types, competitive harm, harm to a lawful procurement process, and a loss of the contract. Those injuries were all caused by the FRA's decision to waive Buy America's Mandate, which has been a mainstay of American procurement law for decades, and it could be redressed by a vacator, which would return the status quo and permit a process to start again. And given the representations that were made to the FRA when federal funding, $3 billion in federal funding was sought. Suppose we agree with you about causation on the front end. This might be one of those relatively rare cases where redressability on the back end is a little bit different. I assume things on the ground have changed, right? Is there a contract now in place with Siemens? There was a contract that was reached after the waiver was granted. What do we know about that? We know that it was – It may be that the contract's in place. They'll face huge breach of contract liability if they try to go the other way. Maybe it's just too late to help your client. Right. Well, the record doesn't support that inference, and there's certainly no evidence of that in the record. That was before the district court, or that's in front of this court. What was said to the FRA when $3 billion in federal funding was sought was that the waiver was necessary for this project to proceed. So that is clear, and that's at JA-47 and 48. The FRA said that – Who's saying that, Alston or Siemens? This is the FRA. When it granted the waiver for the two train sets to be manufactured abroad, the FRA said that without the waiver, Siemens couldn't proceed and that the two first cars needed to be built abroad. And so if the waiver is vacated, then the federal funding cannot continue to be dispersed, and they will have to either seek a new waiver, in which case we'll go through the process again and there's a chance, which is enough for the project to – for the waiver not to be granted, and the competitive situation will have been restored, which is enough under the competitive injury cases. Why wouldn't they just build the trains in America? Well, they said to the FRA that they couldn't. I mean, you can do anything with enough money. So, I mean, it's probably cheaper to build the first two there and have the people train there and then come here and build the other eight. But, I mean, certainly you can build anything in America. Sometimes it's just more expensive.  Well, there is a – to get the federal funding, you do have to get – to build in America, right? So your question is why they wouldn't build in America. I mean, they said – they told the FRA they couldn't. So that's what they told to the FRA. Presumably when they sought $3 million of federal funding, they were saying the truth. There's false claims of liability if you don't. They're now saying in briefing that maybe they don't need to, but there's really no record evidence of that. I suppose they could forego the federal funding, but what they told the FRA is that it was critical to proceed and that the project couldn't proceed without it. And so the record before the court – To your credit, I don't think they will forego the federal funding. $3 billion is a lot of money, but it seems like it probably doesn't cost $3 billion more to build two trains in America than it does in Europe. Right. I guess all I can say is the record before the FRA was that this waiver – that they couldn't proceed with Siemens without the waiver and that the waiver was needed to build the two trains abroad. That they said to the FRA. The FRA accepted that as true. That's in its decision, JA-47 and 48. And so if you accept those two facts as true, which I think we have to, then it follows that, number one, vacater would restore the regulatory status quo and restore the competitive situation that existed before the contracting. It would permit a lawful procurement process to proceed, and there's a likely chance that we would get the contract. And so based on the record, I don't think there's a reasonable inference that could be made that they would build the train sets here. They certainly haven't put evidence in the record that would permit that economic inference. They said they couldn't, but that's in the context of a statutory inquiry whether goods are produced in a sufficient and reasonably available amount or are not of satisfactory quality. That sounds like it's not focused on physical impossibility. It's an economic criteria. And so in that context, you say, well, we couldn't do it here. It doesn't mean physically impossible. Coming back to Judge Walker's question of, you know, if prices now matter because $3 billion are riding on it, well, then you could. And that's not really a False Claims Act misrepresentation. Well, the representation that was made, it's in the Joint Appendix. I'm sorry, I don't have – it's in the waiver request for the Siemens train set. It was necessary for safety and other reasons. And so it wasn't just about price. I think if it had been about price, then the question would have – then the relevant waiver would have been under a different provision, which speaks to whether the cost increased by 25%. And the way the FRA talked about it – again, this is JA-47. It says the first two train sets would need to be manufactured in Germany. That's at the bottom of the page on the right. And then, again, on JA-48 at the top, the FRA says, as such, the first two Valero EMU train sets would have to be manufactured in Germany. So that's pretty definitive. I don't think it's about economics at all. And it's certainly enough for standing purposes to proceed. And so there's an argument made that we can't rely on the procurement line of cases. This is, of course, not just a private bidding. There was a notice of funding opportunity by the FRA to have federal funding in place. And there are regulations in place that require the private bidder in that sort of situation to abide by certain requirements, including to engage in competitive procurement and to abide by Buy America. So we think the Court should reverse on the standing issue, and it should also reach the merits. The merits, of course, include – So on standing, one piece, which we've already talked about, is the incentive they would have to keep working with Siemens. The other thing we're going to hear when the appellees stand up is that you can't do the job. So what is your best argument, based on the allegations of the complaint or anything else on the record, that Alstom actually can do this work? Right. So there are a few things. Number one, Brightline, of course, did seek a waiver. They went through a multiyear competitive process. This is all on the record. Asked for best and final from Alstom and Siemens, went through the process, and the FRA sought a waiver for both Alstom and Siemens. And it wouldn't – I don't – That's true, but how much is that of a cost on Brightline? Essentially, they might just say they're keeping their options open and they wanted a waiver for both companies, but they always knew they were going to work with Siemens. Right. Well, there's no – I guess I would say they did seek the waiver, and if they sought a waiver thinking that we wouldn't be able to do it, that would be an odd thing. That would be a very odd thing to do. And the FRA, in fact, granted a waiver, and the alternative said if we hadn't – if they hadn't gone with Siemens, we would grant the waiver for Alstom. The FRA accepted as true the representation that Alstom could do it. Alstom, in fact, as a company, has built high-speed trains abroad, the TGV, and the FRA says – accepts as true that we would be able to adapt our technology to match the capabilities that Alstom, the company, had built in Europe under the TGV. So that's JA48. It says that our capabilities would be consistent with performance achieved by Alstom's TGV trains in Europe, which are high-speed trains that go beyond 186 miles per hour. So that was all accepted as true by the FRA. It was, I think, if not expressly implied, at least implicitly implied by Brightline when they sought a waiver for Alstom that Alstom would be able to do it. And so for purposes of standing, that is more than adequate to show that we would be able to satisfy the request. And, of course, this dovetails a bit with the merits. I think there's an argument that the FRA relied on our supposed inability to build the trainsets here and having – for purposes adequate to show – fill in the blank for me on the legal standard. Is it reasonable likelihood that you would get the contract? And this is a little bit like a procedural injury case. You could put this in different standing buckets. And I think you need to show definitively that you would get the contract. But what's the line between close enough to create a live dispute going forward and too speculative? Right. So I agree with you, Your Honor. We don't need to show definitiveness or even very likely. And it depends on the standing theory. So if the theory is a competitive injury, then it's really just a restoration of a prior status. By removing the waiver, that's really enough to restore the status quo. Same thing for the procurement injury. But that can't be enough unless you have some chance. Right. You're practically in competition for the bid. Right. And I think the case is just referred to having a chance and don't quantify their requirement. I suppose the line is certainly drawn as if it's too speculative, then that's not adequate. But that's really not the situation. And I think certainly in the procedural injury cases, something akin to reasonable likelihood. I think it's just a standard Bennett versus Speer kind of case where you have an issue. You have a standing issue because we have to predict the effect of a decision on a third party, not before the court.  I think a reasonable likelihood test is adequate in the circumstance of this case. But given the evidence and the reasoning the FRA was represented to the FRA, I think we need a much more stringent standard regardless. Anything else on standing? I'll give you a minute or two on the merits if you want. Well, we do think the court should reach the merits in the interest of judicial efficiency. These are pure legal questions, the brazing pure administrative law questions that this court typically handles de novo without reviewing them from the district court. In this case, of course, jurisdiction is in the district court in the first instance. But the issues have been fully briefed. They are purely legal. An appeal from an adverse ruling in either direction is very likely. And so it makes perfect sense in terms of judicial efficiency and due process and otherwise for the court to reach the merits. The merits, in fact, particularly given how clear the merits arguments are in this case, the argument that was made by the FRA for granting the waiver was that the non-availability waiver varied by technology and design. That's not a ground that anyone adopts today. It was abandoned from day one, and it's clearly wrong. The argument that the government made below for the statute is one that is not sponsored here either. It was post hoc to begin with, but it's been abandoned here as well. And that was the idea that if a single component was built abroad, then that would justify a broader waiver. And now the argument they're making is that the use of the word are produced and are not produced in a non-availability waiver has a different meaning than in the mandate. And that just makes no sense under the plain text of the statute and every canon of construction that will apply to reading it. So the merits are so clear, and it's a pure legal question. And given the arguments that are made about the passage of time, it makes perfect sense for the court to reach in the first instance. I would add that when we were in the district court about a year ago and the court promised to reach a decision quickly, White Line stood up and said there was a need in this case for a quick ruling because all of that, the passage of time, is detrimental to the project and to the expectations of the parties. So I would really think that it would be in everyone's interest and in the interest of the judicial system to just have this court address the merits in the first instance. And we think, again, the merits ruling is clear, where I'm happy to answer questions. I think it's clearly arbitrary and capricious. They're relying on — Judge Walker, Judge Garcia. Okay. Thank you. We have your position. I'll give you a few minutes. Thank you, Your Honor. Mr. Johnson, welcome. Thank you, Your Honor. I'll sum up standing here, Your Honor, and I think that there's three points that bear particular emphasis in light of Mr. Weavey's presentation. The first is that the burden here to show standing is all stumps. The question of whether there's evidence in the record to show a likelihood of how Brightline West will react in a particular way or another particular way to the vacator hypothetically with the Buy America waiver is all stumps burden to meet. True, but we have said that in cases like this, we can think about common sense, economic realities. Right. They're two bidders, and this waiver thing is going to swing $3 billion. It's absolutely true, Your Honor, that you can consider common sense economic realities here. I would push back a little bit on the notion that that sort of set of common sense intuitions is quite as good of a fit here in a case about a discrete competition. And really, you can think of it as a market for one project. It might be not quite as good of a fit here as it is in some of the cases involving larger, more liquid markets. I think that makes it a perfect fit, right? I mean, one or the other of these companies is going to get this contract. But in any case, Your Honor, regardless of whether you think that bucket is the right way to address it, the common sense intuitions here clearly run against all sums standing. As you noted, there's a great deal of water over the dam here, not just since this case was filed, but even leading up to it. This was a five-year procurement process leading to a decision to build a complex, highly integrated high-speed rail system dependent on Siemens trains in particular. There's no evidence whatsoever in the record, Your Honor, that if the waiver were vacated, Siemens – excuse me, Brightline West wouldn't take on any one of the several other options it has to proceed with the project to receive federal funding and to avoid substantial delay without upsetting its key stem supplier relationship. You're not resting on the possibility that they'll just walk away from $3 billion? No, Your Honor. Okay. So what are the other options? If you take as a – we can assume for redressability purposes that you're going to do whatever they have to do to get the $3 billion. And then you have Siemens and Alstom, and Alstom has the domestic option, which allows the $3 billion in funding. And insofar as we know, based on this record, Siemens has a foreign option, which would foreclose federal funding. I don't think that that's correct, Your Honor. Siemens has – to move forward with Siemens, there would be at least two domestic options. The first option, as Judge Walker noted and as we emphasized in our brief, is that they could build the first two trains, in other words, all 10 trainsets here in the United States. And I want to speak briefly to what Mr. Levy said. I don't agree with his characteristic of the record as Siemens and Brightline West representing to FRA that there was, in fact, no way to build the trains here in the United States safely and at reasonable quality without building the first two in Germany. That was certainly at the time highly relevant, as you noted, Judge Katsas, to the government's assessment of whether there was present production of such goods of that class of high-speed train in the United States. But as I read the record of their representations to FRA, it's much more in the nature of there's significant advantages to this practically, that so long as the trains aren't available here in the United States, that it makes sense to be able to do a staged process of localization that would pay significant dividends. I mean, you can certainly say to us that there are strong incentives to figure something out with Siemens. And one plausible-sounding idea is that they would just build the first two here. But a few things are notable. Siemens has never said that, and there might be obvious reasons they're not saying it. But they have not said that. We have no idea how much it would cost. And so how can we say that that's sort of the most plausible outcome here? Well, first, Your Honor, just to return to what I think is really a key point here is that the burden to show standing, the burden to show that Alstom's standing is Alstom's burden. To the extent you have questions about, well, isn't this speculative about what's going to happen? The question is not, is it the most likely thing that Brightline West is going to act in the way that redresses Alstom's injury? The question is, has Alstom shown that it is likely, that it is in fact, and I think it bears, it's worth quoting from Hakadi here, has Alstom shown a substantial evidence of a causal relationship between the government and Brightline West conduct that leaves little doubt as to the likelihood of redress? And here, where they could build the first two trains in the United States, or, frankly, they could simply operate the railroad with eight train sets instead of ten. And where they have options to proceed with their chosen supplier or relationship that they had envisioned with last decades, they spent more than five years picking. It seems plain to me that it is, at the very least, not clearly likely that they are going to react. Can you give your answer to Judge Katz's question of how much more likely does it have to be? We have cases that say a significant increase in likelihood. We have cases that say if it's at least as plausible one way or the other, is it 51%? Is it something like a 30% chance? What do you, how would you want us to think about that? This court explained in Hakadi, and I think this is consistent with what the Supreme Court said in Diamond, that the question is likelihood. Typically, when courts refer to things being likely, that would mean 51% chance. And, in fact, Hakadi specifically says that it's not sufficient to show standing if it's merely a matter of, oh, it's as plausible that it will happen one way as that it will happen another. It's a question of likelihood. Is there a likelihood that this court's opinion potentially vacating the waiver is going to be something other than advisory? Suppose we think of this as a little bit like a procedural injury case. It's a little bit like a fair bidding, fair process case, right? In cases like that, the grief party typically doesn't need to show a high degree of likelihood that it will succeed once the procedural error or the tilting of the competitive field is set aside or equalized. Well, there's two key links here in terms of that redressability analysis that are missing. There are two key links there, Your Honor, that are missing in this case. First, if you think of this as a big process-type injury, certainly you can imagine if we were here in a private contract suit that the bidder in a purely private procurement would argue, you defrauded me, you injured me somehow by treating my bid unfairly. And you could imagine that giving rise to standing and the opportunity to issue a redressable judgment with respect to that private party. Even if you don't know that that private party would get the contract? Exactly, Your Honor. On remand in a fair process. Exactly, Your Honor. And in the cases where the government is the one soliciting the bids, it works exactly the same. You can order the government to vacate the award. And according to the procurement laws and regulations, if the government then wants to go forward buying what it wanted to buy in the first place, it needs to conduct a new solicitation. And that's where the redress comes in. We accept that the outcome of that solicitation isn't foreordained, and we treat it as redressability the fact that this court can, in effect, order a new solicitation. And this seems analogous, right? It's not, Your Honor, because here the government wouldn't be ordering the contract between Brightline West and Siemens to be vacated. It wouldn't be ordering Brightline West to conduct a new solicitation. It would be vacating the waiver and leaving Brightline West to determine. Brightline will have to make a new assessment that's unburdened by, you know, we assume the merits for standing, so unburdened by an unlawful waiver. Perhaps in some theoretical sense, Your Honor, Brightline will have to say, well, you know, we've made a decision. The status quo has now been upset. And in some formal sense, we need to make a new decision. That's a far cry from reopening a bidding process, which there's no evidence in the record that they would do, and which we know they wouldn't have to do. I don't think that they'd be perfectly allowed under the terms of their own agreement or under – there would be no obstacle in federal procurement law that I'm aware of for them simply deciding, well, now that we don't have this waiver to build two train sets in Germany, we're going to either build all 10 in the United States or move forward with eight. There's no legally required step that they would be needing to take that would give Alstom the opportunity to compete anew in the way that you see in the government procurement process. It's more than just something ministerial, dotting an I, crossing a T, if we take your very reasonable admission that the $3 billion subsidy is driving these arrangements, driving their decisions. Nevertheless, Your Honor, I think what's underlying the discussion that we're having is that the procedural injury is not really what would be redressed here. If the procedural injury is Alstom was forced to contend with what it says is an unfair bidding process, the bidding process wouldn't be undone. What would be undone is the waiver that is underlying the current arrangement under which Brightline West can receive federal funding. The real injury that Alstom would be seeking to be undone, that it claims could be undone by Brightline West potentially moving in a different direction commercially, is the opportunity to compete in a meaningful way for this particular contract. I'm not sure you can slice things up that way, though. The Supreme Court has said a procedural injury in a vacuum is not concrete for Article III purposes. It has to be linked to the possibility of securing something tangible at the end of the process. It comes back here again, Your Honor, just to whatever procedural injury Alstom alleges to have suffered isn't one that this court's judgment would be remedying. It wouldn't be remedying any alleged procedural injury in the bidding process as between Alstom, Siemens, and Brightline West. And to tie off one quick loose end, Your Honor, from something you mentioned earlier, I think the same goes if you put this in the sort of competitive injury bucket. Similarly, ordinarily, when we look at the sorts of cases that competitive injury comes up in large liquid markets, we can make presumptions that when a supply of a particular fungible good is contracted or expanded, that the market will react in predictable ways. Here, those same intuitions don't necessarily hold with respect to a very complex, carefully procured high-speed train set. But even if you were to look to sort of general intuitions about how the commercial realities here would play out for the reasons I've explained, the reasons we've explained in our brief, there's simply no likelihood that Brightline West would move to blow up its key supplier relationship when it simply doesn't have to based on the facts in the law before the court. And just briefly on the merits, Your Honors. Before you go to that, how much more, how much better, let's assume that the cost of an Alstom contract and a Siemens contract are the same. They both say, you know, put aside the waiver, all this, just like we will both deliver you 10 trains. Siemens, I think, offers a better product because they've built trains this fast before and Alstom hasn't. It's a little hard to quantify how much better that deal is coming from Siemens than from Alstom. Can you try to say, I mean, how much better is Siemens as a partner here than Alstom? I would defer to Brightline West Council to give you some of those details, Your Honor. What I can say standing here representing the government and with the record in front of me that you have is that the evidence clearly shows that Brightline West thought very, very hard about this. And it made a carefully considered decision and that there is little to no, nothing to suggest in the record that it would blow up that decision today. And they made that decision before the waiver. They did, Your Honor, yes. Just briefly on the merits. Sorry, one last question. Yes. Do you agree the standard of review is, or we should proceed as if we're reviewing a motion to dismiss, right? So we're applying the Twombly standard? I don't think it makes a difference to the outcome in this case, Your Honor. There is an administrative record produced. There was a declaration put in the record by Brightline West. It was targeted to the disruptive effect that an injunction would have.  The plaintiff hasn't put in a declaration because we're on a motion to dismiss. That's sort of what I'm getting at. I think that that would be the most straightforward way to review the judgment bill, Your Honor. What would be the most straightforward? As Judge Garcia mentioned, to review this as a ruling on a motion to dismiss. They said don't dismiss. But, I mean, unlike a motion to dismiss before discovery, there was a lot of discovery. And this is what I think it's important to note that I don't think it makes a difference to the bottom line of this case. If you were to proceed as Judge Garcia suggested and look at only the four parts, the complaint and other things subject to judicial notice. Let's say we said reversed on the motion to dismiss. And then the district court tomorrow says, okay, I got all the discovery in front of me. Summary judgment, no standing. I mean, right back here. Why wouldn't we just say whether there was a motion for summary judgment? Yes. So why wouldn't we say whether there was standing under the summary judgment standard? There's enough. I think that there's enough in the record, Your Honor, that you could certainly proceed and say there's been a significant exchange of factual material in this case. This is an administrative record produced. This is a suitable vehicle for deciding on a summary judgment-type ground. And if that's the case, then also lacks standing for all the reasons I just expressed. It might cut the other way. I mean, it might be the stuff in the discovery helps show that there is standing. Certainly. And this is what I was getting at in response to Judge Garcia's question. That if you look at, I believe it's paragraph 48 of Alstom's complaint, that's really all there is in the complaint that goes to addressability. And it's really very little. It's substantially less than we've been talking about in terms of the relative to what we've been talking about here today at argument. So if, indeed, this is a motion to dismiss case, it's an even clearer win for the government. What standard did the district court apply? There were cross motions for summary judgment and to dismiss. As a practical matter, Your Honor, the district court, I think, applied a summary judgment standard. It considered that declaration I mentioned to Judge Garcia. Although the declaration was put in for, I think, irreparable harm grounds on the PI application that is not currently in front of the court, the district court considered it for summary judgment purposes. I don't believe that there was any objection to that below. If the court wants to proceed on that basis, I think the district court did, and we wouldn't have any objection to that, certainly. Briefly on the merits, Your Honor, unless the court— We have not taken a position on whether we should breach the merits. We have not, Your Honor. Understanding that— Why not? I mean, isn't it in everyone's interest, if we think they're standing, get this $12 billion infrastructure project of some importance to the people in the Southwest, why wouldn't we remove this cloud or reset the rules sooner rather than later? Your Honor, on further reflection subsequent to filing the briefs in this case, we do think that it would be appropriate to reach the merits. We would urge the court to do so if, indeed, it does find standing. We, of course, recognize this court has discretion to decide the best use of its resources and that the factors supporting reaching the merits here, a clean legal issue, relatively light record, will be present in many cases, and we trust the court to access its discretion there. One thing we would emphasize, however, if the court does reach the merits and if the court does rule in Alston's favor, we would urge that the judgment not be to remand the district court with instructions to vacate the waiver but rather be to remand the district court with instructions to hear from the parties further on remedy. As the court is well aware, whether to remand with or without vacater to the agency, a great deal is going to turn first on the rationale this court applies if it does, indeed, find the waiver was unlawful, and second, a great deal will turn on the disruptive consequences of vacater, which, given the amount of time that has passed since the briefing in the district court, I think it would be fair and reasonable for the parties in the district court to have an opportunity to submit evidence as to what the practical consequences of vacater would be and how the parties in the agency would proceed following that. Anything else, Judge Garcia? Okay, thank you. Thank you, Your Honor. May it please the court. Alice Lockrum for Brightline West. Plaintiff falls far short of satisfying the high standard that this court has set for establishing Article III standing to sue the government based on the conduct of a third party. Congress left the selection of the vendor, of who the vendor will be, to private actions, and Brightline West selected Siemens for reasons outside of the FRA's control, specifically, as Judge Walker indicated, Alstom just couldn't do the job. The only bidder that had satisfied the project's requirements was Siemens. They were the ones that offered service-proven train sets. Judge Garga? I don't want to go so far as to say Alstom couldn't do the job. It's similar to the question I was asking them, but reversed. I mean, I think with enough money and enough time, surely Alstom could figure out how to build a train that goes this fast. But I think they needed to show in the record how much that would cost and compare it to how much it would cost Siemens to build the extra two trains in America. And then if one number is way bigger than the other number, then it's going to be awfully hard to think a rational company in your position would have canceled the contract with Siemens and gone with Alstom. Correct, Judge. Can you put some details and some concrete information on that structure? Well, the problem with that structure is there's too much speculation on Alstom's side about what they would have to do. All we have in the record, and this is at J291, is that they would have to make substantial modifications to increase power capacity and traction to achieve the required speed and performance capacity for the project. So there's just too much speculation on their end, and they had never manufactured in their New York facilities any type of train sets that could meet this requirement. On the other hand, we had Siemens who had service-proven, so it would just be more feasible. In response to your question, it would be more economical to just work with Siemens, including on a delayed project that would build all of them, because as Siemens has indicated, their facility is going to be built by the end of this year. And I agree with you, at least the implication of what you're saying, that I think it's their burden to show that there's a substantial likelihood that the economics would cut in their way, and they haven't shown that. You're not giving me a lot to make me think it cuts in your way, because you're not really telling me how much more you think it would cost Siemens to build here and how much better a deal with Siemens is than a deal with Alstom is. But I mean, I guess in your defense, I don't think that's your burden. But if you can give me more, great. Well, I mean, I think what we would say is we have the declaration in the record, and that's JA 132, 133, and they indicated by at least by November 2024, we had made it would be our CEO of the company said it would be a substantial disruption to sort of stop with Siemens and to try to think about different alternatives. And that's in the record. We also have, in terms of reach. Well, I guess what we agreed to know, again, I think it was their burden, but what is the cost of that substantial disruption, and how does that cost compare to the cost of Siemens just building the two trains here? Well, the difficulty, again, is they've never satisfied the requirements, even to this day that we don't know that they've satisfied the requirements. At this point, it's too much water under the bridge. The company has been working with Siemens. They've invested millions of dollars, as well as a significant amount of time. So any project of this size, you're going through engineering plans. And as indicated on JA 292, each one of these companies, while they offered, they offered their own approaches to the requirements for this project for full electrification. So at this point, we've been working with Siemens, and we've been building plants, including train stops that are set and designed to work with Siemens trains. So we've had a significant amount of time, public funds, and effort that's been with the Siemens project. There is zero chance that Brightline West would change vendors at this point. So you're not saying that's the case if Siemens was definitively denied a waiver, right? You're not standing here and saying you would forego $3 billion to avoid working with Alst? Well, I think what the relief that's requested by the plaintiff is that they would ask that the portion of the FRA decision that waives the two train sets broad be taken out.  That's why we're asking all these questions about how much it would cost to be in the U.S. for those two or what Siemens would do, and maybe that was Alstom's burden. But it sounds like you also, the technical question would be, what are the costs of whatever the alternatives of proceeding with Siemens are compared to the costs of working with Alstom? And it sounds like we don't really have evidence on any of those variables, other than you certainly have strong incentives to figure something out with Siemens. Well, we do have strong incentives. We do have a declaration. We do have a declaration that indicates that there was, by that time, by the district court and the district court indicated in her decision at that point, at least at the project, by the time of her decision, there was $140 million that had spent. And that is, again, invested in Siemens' idea, Siemens' concepts for this particular project. And so if, following up, if the vacature, if there was, if the FRA portion of the FRA's decision was vacated, as the FRA indicated, we would do everything we could to stay with Siemens, including sort of working with having all 10 train sets built in the United States, maybe going with eight train sets. There's all sorts of different possibilities, but we would work, we would not go back to the Alstom because too much money and time has been invested. Those possibilities all make sense to me in a sense, but there's no declaration in the record. Again, maybe this wasn't your burden, but there's not a declaration saying that they would even consider doing all 10 in the United States. No, no, Your Honor, there is not. There was no definitive declaration on that. And you have represented that even if Alstom wins this case, you're not hiring Alstom. That's correct. Why not put that into evidence? Well, I mean, I think if you look at the declaration that's in the record, it's there. What I'm just adding is a little bit more color and definitiveness to it. Where in the record does it say, even if Alstom wins this case, we, Brightline, are not hiring Alstom? No, it does not say that explicitly, Your Honor. Why not put that in the record? It's one sentence declaration. It's a long declaration. Well, Your Honor, I mean, right now we're working with the record that we have, and we don't have that in the record. But if you look at the declaration, which was filed in opposition to a preliminary injunction, that's basically what the declaration is saying. They're saying we've invested all this money in Siemens. We've already been working. We're opposing a preliminary injunction of the waiver. It's my burden. I don't think it's your burden to show that they don't have standing, so I'm not saying this is dispositive. But it does cast some doubt on your representation that you're not going to hire Alstom when it would have been really easy to just declare that as a piece of evidence in the record. Well, I mean, it's not in the record. That definitiveness is not in the record. But there are other things in the record, you know, that, you know, we've made substantial investments and all that. If there's no further questions. Just one last question. Alstom's main answer to these kinds of questions was, well, Brightline pursued a waiver for us, so they must have seriously considered working with us. Why isn't that a persuasive point? Well. Why bother if you just never thought Alstom could do the work? I think what had happened in terms of before Brightline had sort of looked at the project requirements and made a decision, they had already put in the waiver request for both of them. So in terms of the timeline, and then, as you know, it's in the complaint, actually, that they, that Brightline Waste made a decision and then the FRI did. So. It was more of a keeping your options open kind of thing. Well, I think it's just the timeline. It's just that they, at the time that they made the, put in the waiver request, they were considering and they were taking the proposals in. But once they sort of considered them and gone through it, they realized they just had not met the project requirements and that Siemens was the only option. I mean, you probably had a better negotiating position with Siemens if they thought Alstom was in the picture. That would be one reason to keep Alstom in the mix. Right. In terms of economic. If there's no further questions, we urge the court to affirm. Thank you.  Mr. Prince. Thank you, Your Honors. Andrew Prince on behalf of Siemens. I'll just make a few points. I don't want to belabor it, but at least Alstom's arguments are proceeding on the false assumption that they are in the market for 186 mile per hour trains. But let's be clear. They don't have 186 miles per hour trains. At the time this waiver decision was issued, they hadn't even built their lower speed, successfully built their lower speed Amtrak trains. We cite at page four of our brief, all of the OIG reports, their windows were literally exploding on those trains and were multiple years behind. So the selection of us was not just a cost issue, Judge Walker. It was just like we actually had the trains. What was that detail? The windows were exploding? The windows were spontaneously exploding on their test trains. It's all detailed in the OIG reports. How fast did their trains go? Remind me. I believe those ones maxed out at 160, which is like a totally different category. That's the Acela on the northeast corridor? It is the next generation Acela. They can move it that fast. Yeah. Well, they don't. But, I mean, if you've been on those next generation Acelas, it's not what Brightline has in mind for this project. Part of that is the tracks. Not that this is this case. Yes, that's true. But my point is this wasn't just a cost competition. It was something we could do it now. Brightline is pretending they could do it. But, in fact, they needed to make substantial improvements to their trains to be able to even compete. And the reason why we had to build the first two overseas also wasn't necessarily related to cost. I mean, our factory is almost done here, and we are going to build the other eight trains here. It also had to do with the fact that because this is a first-generation project in the U.S., the U.S. doesn't have a commissioning and testing infrastructure really set up, but they have reciprocity agreements with, you know, like developed foreign governments that allow easier commissioning of the trains if they're certified overseas. So it was really like a project timing issue more than a cost issue. But, of course, there's another point I wanted to mention, which is, you know, Alstom has absolutely zero evidence in the record below. They put in no standing declarations, even though there were summary judgment proceedings. They didn't even put in a declaration supporting irreparable harm. And so, Judge Katsas, you asked, like, why don't we just go ahead and reach the merits? And I appreciate I'm going to try and have my cake and eat it too here. If you disagree with the district court's findings on standing, but you also agree that Alstom loses on the merits, I think that's fine. But I think it would be very unusual for you to disagree on standing and reach the merits and effectively grant summary judgment to Alstom in a case where, you know, a lot of their standing theories, as we've been kind of teasing out here, require evidentiary support, and there is none supporting the summary judgment standard. Well, if we reached the merits, we would only do so if we thought that they could be resolved on summary judgment without getting into factual disputes, of course. Of course. But, you know, you would think if they're pressing a lost profits theory, I mean, they need a declaration at least establishing that there would be some lost profits, and they have none, right? On the merits themselves, the court doesn't seem that interested in them. That's what I primarily briefed. I'll just make a few points. They're fundamentally just misrepresenting the FRA's decision. The FRA, talking about these technology distinctions that was in response to a comment by a commenter, the FRA's finding was very clearly there are no current domestic manufacturers of 186-mile-per-hour high-speed trains. The waiver provision is clearly using the phrase in a verbal present sense. It's asking a here-and-now inquiry about whether there is current domestic production, and there is none. I'm sorry to interrupt, but I just had a few questions about standing still. Sure. One good answer to all of these questions might be that it's their burden, but it struck me that Siemens, a lot of what we've been talking about is speculation about what Siemens would do if this waiver were vacated.  And are you authorized to make any representations about the Siemens willingness and ability to make the first two trains in the United States or anything bearing on the standing issue? Sure. Well, so first of all, those two trains are well under construction already in Germany, so it would depend on the basis on which you vacated the waiver. If it was that, you know, they didn't explain it clear enough and there was a possibility of regranting the waiver, remember the agency could just regrant the waiver on public interest grounds. You have to assume for standing purposes that we rule for them on the statutory ground. And the conclusion is there's no possible way they could grant a non-availability waiver. They could still grant a public interest waiver, so I'll just qualify that. We have almost completed our factory here, and we would work with Brightline West to figure out how to build the trains here. I mean, that's what we would do. I mean, otherwise we have a wasted factory. We've just spent millions of dollars building this factory. But, you know, if the court has no further questions for me, I appreciate the court's time. Thank you. Mr. Levy, we'll give you two minutes. Thank you, Your Honor. I think a few points I just wanted to raise. A lot of the questions have focused on whether Brightline would go with us if they were a vacater and a remand. Of course, we don't have to show that. But I think the evidence is clear that the arguments they're making are not supported in the record that was before. There's a pretty strong sense from all of us that we don't have much – we have very little certainty what would happen one way or the other. Doesn't that – why doesn't that imply that you lose because it was your burden to show addressability? Substantial likelihood, whatever the standard is. It's your burden to make that show. Well, I think, number one, is we don't have to show that we would get the contract in the but-for world, right? The competitive arm – I get that. Right. So that's enough. And we don't have to make that further showing. If the court determined that we did have to show a likelihood or some likelihood that we would get the contract, I think all the record evidence shows that we would. A lot of the comments that were made by my friends have focused on Alstom's ability to build these train sets, and I just want to go through what they've cited in the record. So they cited JA-29 – first of all, the declaration, JA-129. It's notable that it doesn't go into any of the issues that are being raised today. I realize it was raised in a different context, but the district court relied on it, and it really doesn't get into any of these issues. They cited JA-29 – We could have put in a declaration or develop evidence on all of the standing questions we're asking today. We could have put in a declaration. There was no discovery in this case. There was a submission of the administrative record, but we proceeded by way of summary judgment, and they cross-moved to dismiss. Page 12 of the district court's opinion, it says in the JA-249, Alstom has not offered any evidence that it could, in fact, meet Brightline's requirements for the project. Right. I don't think that's true, and I can cite – and it's in the documents that they cited, and it comes from – so JA-290 and 291, which my friends cited, that's Brightline's request for funding, and it was done before for the waiver. It was done before the FRA proposed to waive for both Alstom and Siemens. JA-290 introduces both service-proven European HSR technology, and that's in the – that's at 10.3, the introduction, and it then goes on to speak about rolling stock.  Are you saying – first of all, just before you – are you talking about stuff that's in the sealed record, or are you talking about stuff that's in the public record? I think this is in the sealed record, Your Honor. We're not – we're in a public setting. Okay. I will not – so if the court looks to the heading, I think the parties have quoted the word service-proven. It's clear what it's being referenced to, and then on 291, the court can look at it, and it's referring to which are service-proven. My friend cited from this passage, 291, and quoted from it, or purported to, there's a – she said there was a reference to a substantial evolution being needed. That evolution is a reference to the next Genesela, which is in production now, which has happened not to the evolution that would be further required. And then in the next – in the middle of the page, there's a reference to what Alstom would need to do, and it's – this is, again, recited in the FRA's document, which is just to evolve to use the TGV technology, which did achieve 186 miles per hour. So the fact is we could do it, and we – and there's no – that is adequate evidence, the fact that the right line that sought the waiver. So whether I'm persuaded by that or not, I think you have made a pretty good case that we should be assessing this under the summary judgment standard. I believe so, Your Honor, but based on the evidence, I don't think it's a close question in our direction. I would also point to J326, which is in the sealed record, which I think is consistent with what counsel from Siemens is saying, which is that this was about safety and not about money in terms of the waiver. I don't want to float it into the evidence just because it's sealed – into the – I'm sorry, into the courtroom because it's sealed, but J326, the first full paragraph. And then when Brightline changed its – decided to seek a waiver – sorry, to select Siemens as its preferred vendor, this is JA73. This part is public. It didn't say that Alston couldn't do the trains, even though that would have been pretty probative in the context of seeking a waiver. It just said, BL, that Brightline had announced its selection of Siemens Mobility, Inc., as its preferred bidder for the supply of rolling stock for the project. That's it. And it would be one thing if Siemens had said either there – sorry, if Brightline had said either there or in its declaration that was submitted to the court that Alston couldn't do these trains. It never did that. And the FRA didn't proceed on that assumption. It said it would have granted a waiver for Alston, too. And it could only do that if it thought that we could build the trains domestically. Stephen says it's already built a factory here. Do you have a response on that? Well, it wasn't part of the record in terms of summary judgment. I saw there's a reference to a news article that the factory is under construction. We also have a representation of counsel that they needed to build them in Europe for purposes of safety and that they've started building the trains in Europe. So if they've built the trains in Europe, I suppose they could forgo that. But this is inference upon inference about what they would do. And I realize it's our burden, but we've done more than enough to satisfy the burden. Anything else? Anything else? Okay. Thank you. Thank you, Your Honor. The case is submitted.
judges: Katsas; Walker; Garcia